FILED
2026 Sep-18 PM 01:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| TERESA G. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-01504-NAD |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER REVERSING AND REMANDING THE DECISION OF THE COMMISSIONER**

Pursuant to 42 U.S.C. § 405(g), Plaintiff Teresa G. Wilson filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits. Doc. 1. Plaintiff Wilson applied for disability benefits with an alleged onset date of November 30, 2021. Doc. 8-3 at 58; Doc. 8-4 at 2–3; Doc. 8-9 at 2; Doc. 8-10 at 2–13. The Commissioner denied Wilson's claim for benefits. Doc. 8-3 at 2–6, 19–45. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 12; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **REVERSES** and **REMANDS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Wilson argues that the court should reverse the Commissioner's decision for four reasons: (1) the Administrative Law Judge (ALJ) "erred when he failed to address Teresa's homelessness"; (2) the ALJ's decision is not supported by substantial evidence; (3) the ALJ did not incorporate any limitation for Wilson's moderate limitation in her ability to concentrate, persist, and maintain pace in the "Residual Functional Capacity" (RFC) determination; and (4) the ALJ "erred and violated HALLEX 01290.085 when he said he would address Teresa's express request to reopen a prior decision but failed to rule on the matter." Doc. 15 at 2.

Because the court will reverse and remand on the basis that the court cannot determine that the ALJ's decision was supported by substantial evidence—in particular, with respect to the Paragraph C Criteria—the court need not reach the merits of the other issues that Wilson has raised in this appeal.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505.

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

> (1) whether the claimant is engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has a severe impairment or combination of impairments;
>
> (3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;
>
> (4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and,
>
> (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial

evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. And the

Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

## BACKGROUND

### A. Wilson's personal and medical history[1]

Wilson was born on November 30, 1971. Doc. 8-9 at 2. Wilson has had essentially no income since 2017. *See, e.g.*, Doc. 8-9 at 23; Doc. 8-10 at 22.

In March 2014, Wilson visited Quality of Life Healthcare with chest tightness and anxiety, as well as compulsive thoughts and reduced need for sleep. Doc. 8-15 at 38–39. Wilson reported that she could not afford medication and was given educational materials. Doc. 8-15 at 40–41.

In October 2016, Wilson visited Quality of Life with depression characterized by anxious and compulsive thoughts, decreased need for sleep, and difficulty concentrating. Doc. 8-15 at 49. She reported chronic anxiety and depression. Doc. 8-15 at 49. She reported drug use and scored in the range of moderately severe depression on an assessment test. Doc. 8-15 at 49–51.

In February 2017, Wilson had a follow-up at Quality of Life, during which

[1] Some of the medical records in the record (Exhibit 10F) appear to belong to a different Teresa Wilson. Doc. 8-20 at 98–175.

she reported continued anxiety. Doc. 8-15 at 58. She stated that she found it somewhat difficult to function, and that she was not taking medication due to the expense. Doc. 8-15 at 58.

In April 2019, Wilson took a screening test at Quality of Life that indicated no alcohol or drug problems. Doc. 8-15 at 65. A screening test indicated mild depression. Doc. 8-15 at 66. She had pain in her left hand and a diagnosis of anxiety disorder and was referred to behavioral health. Doc. 8-15 at 73, 77–78.

In August 2019, Wilson reported to the Gadsden Regional Medical Center emergency department for a hand injury to her right hand and alcohol intoxication. Doc. 8-15 at 95.

In May 2020, Wilson was admitted for inpatient psychiatric care at the Gadsden Regional Medical Center due to paranoid and manic symptoms; she was diagnosed with schizoaffective disorder, bipolar type. Doc. 8-16 at 6–9. She reported a history of drug and alcohol abuse but had a negative urine screen. Doc. 8-16 at 9. She was homeless at the time. Doc. 8-16 at 9. Wilson was ultimately discharged from psychiatric care with diagnoses of acute psychosis, amphetamine abuse, and amphetamine and psychostimulant induced mood disorder. Doc. 8-15 at 110. Wilson had presented to the emergency department with manic, psychotic, and delusional behavior after using methamphetamine and marijuana on a regular basis; she reported that her main stressor was being homeless. Doc. 8-15 at 110–11.

Wilson was "only interested in staying in the hospital and avoiding homelessness." Doc. 8-15 at 111.

In June 2020, Wilson was admitted to the Brookwood Baptist Medical Center with a manic episode after being assaulted by another woman at the Lovelady Center. Doc. 8-18 at 6–7; Doc. 8-22 at 16–28. She stated that she had a history of drug and alcohol abuse but was clean at the time. Doc. 8-18 at 7.

In November 2020, Wilson reported to the Gadsen Regional Medical Center emergency department with hand pain after an acute injury. Doc. 8-18 at 47. She was homeless at the time and was staying at the Salvation Army. Doc. 8-18 at 47.

In February 2021, Wilson reported to the Gadsen Regional Medical Center emergency department and expressed fear that she had been "poisoned." Doc. 8-18 at 56. She was homeless at the time and was using amphetamines and marijuana. Doc. 8-18 at 56–57. She was paranoid and having delusions. Doc. 8-18 at 58.

In March 2021, Wilson presented to Quality of Life complaining of anxiety, musculoskeletal pain, and lupus. Doc. 8-19 at 60. Wilson reported that her anxiety made functioning "somewhat difficult," and that she had difficulty concentrating. Doc. 8-19 at 60. She reported that her anxiety was aggravated by conflict, stress, or traumatic memories, that she had a history of chronic illness and drug abuse, and that her anxiety was associated with chronic pain. Doc. 8-19 at 60. She reported that she was homeless and "living with an attorney friend who is assisting her." Doc.

8-19 at 60. Wilson self-reported that her symptoms made it "somewhat difficult" to work, take care of things, and get along with people. Doc. 8-19 at 62. Her responses indicated "moderate depression." Doc. 8-19 at 62. She presented with anxious, inappropriate mood, poor insight, poor judgment, poor attention and concentration, pressured speech, and paranoia. Doc. 8-19 at 67–68.

In April 2021, Wilson presented to Quality of Life for a follow-up appointment for problems with her hand; she reported anxiety that made functioning "somewhat difficult." Doc. 8-19 at 11. She reported anxious thoughts, depressed mood, and difficulty concentrating, among other symptoms. Doc. 8-19 at 11.

On May 12, 2021, Wilson had a telephonic psychiatric diagnostic evaluation at Quality of Life for anxiety and depression. Doc. 8-19 at 5. Wilson reported that she had been taking Paxil since April and it helped "slow [her] down." Doc. 8-19 at 6. Wilson reported that she was living with her sister, whom she "doesn't get along with." Doc. 8-19 at 6. Wilson reported she was "basically homeless for about a year" and was "financially stressed" after being denied Social Security benefits, but was "trying to get back on her feet." Doc. 8-19 at 6. Wilson stated that she had not had previous professional behavioral health care; a referral to a psychiatrist for medication was recommended. Doc. 8-19 at 6. Wilson was depressed and anxious but cooperative and otherwise presented normally. Doc. 8-19 at 6–7. She was diagnosed with moderate major depressive disorder and moderate generalized

anxiety disorder. Doc. 8-19 at 7. Wilson reported that she was living at The Father's House and "loving it." Doc. 8-19 at 50. She reported that she was "getting back on track" and looking forward to the future. Doc. 8-19 at 50.

On June 22, 2022, Wilson saw Debra Tuberville for a telephonic appointment at CED Mental Health Center. Doc. 8-21 at 49. Wilson reported that she "has a problem trusting people," but that it felt good to know there are people who care for her. Doc. 8-21 at 49.

On June 23, 2022, Wilson went to the Geraldine Clinic with multiple complaints, including a request for medication for anxiety. Doc. 8-21 at 11. She was prescribed Fluoxetine for her anxiety. Doc. 8-21 at 12. She was assessed as functional with no mental disability. Doc. 8-21 at 13.

On July 11, 2022, Wilson filled out an adult function report. Doc. 8-10 at 14–21. Wilson stated that she lived at a rehabilitation center. Doc. 8-10 at 14. She reported problems with her right hand, degenerative disc disease, bad back pain, trouble walking and sitting, inability to lift over 10 pounds, headaches, and fatigue. Doc. 8-10 at 14. She reported that she did not leave the house often, and could go out alone but did not have a car; she reported that she shopped in stores for basic necessities 1 or 2 times per month for about 30 minutes. Doc. 8-10 at 17. She stated that she could pay bills, count change, handle a savings account, and use a checkbook. Doc. 8-10 at 17. She reported that she spent time with others in person

and over text, and that she watched her grandchildren play and went to church on the weekends. Doc. 8-10 at 18. She said she went to church mostly every weekend, and that she occasionally had problems getting along with family members. Doc. 8-10 at 18. She said she used to be more social but did not "like being around a lot of people anymore." Doc. 8-10 at 18. She said she had no problem with attention or following instructions and got along fine with authority figures, and had never lost a job because of problems getting along with people. Doc. 8-10 at 19. She reported taking Prozac, ibuprofen, and sinus medicine. Doc. 8-10 at 21.

On August 2, 2022, Wilson's daughter—Kristen Wilson Foreman—filled out a third party adult function report. Doc. 8-10 at 30. Foreman stated that Wilson lived in The Father's House rehabilitation center. Doc. 8-10 at 30. Foreman stated that Wilson attended church, and that Wilson could not work because of pain in her hand and back. Doc. 8-10 at 31–33. Foreman stated that Wilson could still do most tasks, it just took her longer. Doc. 8-10 at 32.

On September 6, 2022, Jerry Bynum, Ph.D., examined Wilson for a psychological assessment. Doc. 8-20 at 180. Bynum noted that Wilson's history showed anxiety disorder, paranoia and mania, acute psychosis, amphetamine abuse, and amphetamine and psychostimulant induced mood disorder. Doc. 8-20 at 180. Bynum noted that Wilson had received inpatient psychiatric care in 2020, and had spent much of her life in abusive relationships or shelters for abused women. Doc.

8-20 at 180–81. He stated that she was currently living at The Father's House and had been prescribed Prozac and group therapy. Doc. 8-20 at 180–81. Wilson reported that she had been free from substance abuse for about 90 days. Doc. 8-20 at 181. Bynum estimated low average intellectual functioning. Doc. 8-20 at 182. His diagnostic impression was moderate anxiety disorder, history of polysubstance abuse, and possible unspecified personality disorder. Doc. 8-10 at 182. Bynum opined that the "prognosis for significant mental improvement is guarded," but could improve with continued treatment. Doc. 8-10 at 182. He stated that social impairment was moderate, ability to understand simple/familiar tasks was mildly impaired, ability to understand complex/novel tasks was moderately impaired, and ability to tolerate job related stress was moderately impaired. Doc. 8-20 at 182.

On September 22, 2022, Dr. Jimmy Oguntuyo performed a medical disability exam. Doc. 8-20 at 185–87. The exam focused in large part on Wilson's hand and back pain, but Dr. Oguntuyo noted that Wilson had a history of hallucinations that had resolved, and that her anxiety was stable on Prozac. Doc. 8-20 at 185.

On November 10, 2022, Wilson returned to the Geraldine Clinic for a sick visit and was diagnosed with an upper respiratory infection. Doc. 8-21 at 14–15. She did not complain of mental health symptoms. Doc. 8-21 at 14–15.

On March 16, 2023, Wilson had an appointment with Samuel Griggs at CED Mental Health Center. Doc. 8-21 at 30. Wilson reported a history of drug and

alcohol abuse. Doc. 8-21 at 34. Wilson had appropriate appearance and affect, mildly impaired memory, normal thought content, and good judgment. Doc. 8-21 at 35–36. Her diagnoses of schizophrenia and anxiety were noted. Doc. 8-21 at 38, 41.

On March 28, 2023, Wilson filled out another function report. Doc. 8-10 at 58–65. She stated that she was living in a shelter and was in pain every day from multiple physical issues. Doc. 8-10 at 58. Wilson's function report focused primarily on issues with her right hand. Doc. 8-10 at 59–60. She stated she shopped in stores about once a week, could pay bills, count change, handle a savings account, and use a checkbook, spent time with her grandsons, and went to church. Doc. 8-10 at 59–62. She stated she did not "socialize much anymore" because it took too long to get ready. Doc. 8-10 at 62.

On March 29, 2023, Wilson's daughter filled out another third party adult function report. Doc. 8-10 at 73–80. She stated that Wilson lived in a transition home, and that they ate or watched tv together several times per week. Doc. 8-10 at 73. The report focused primarily on limitations because of Wilson's hand, but said Wilson shopped in stores once a week and could pay bills, count change, handle a savings account, and use a checkbook. Doc. 8-10 at 74–76.

On April 17, 2023, and May 1, 2023, Wilson had telephonic appointments at CED Mental Health Center with John Brock; she was seeking to "stay clean and get

out on [her] own." Doc. 8-21 at 18, 22. Wilson was clean and sober at the time. Doc. 8-21 at 19, 23. Wilson reported an increase in stress because there were plans to close the transitional home in which she had been living. Doc. 8-21 at 19. She had no serious mental health symptoms at the appointment. Doc. 8-21 at 20, 24.

On September 8, 2023, John Brock at CED Mental Health Center discharged Wilson from their care. Doc. 8-21 at 65.

On September 13, 2023, Wilson saw Dr. McCain at Quality of Life for musculoskeletal pain and lupus. Doc. 8-21 at 100. She did not report psychological symptoms. Doc. 8-21 at 101–02.

On October 24, 2023, Wilson saw Dr. McCain at Quality of Life for pain and anxiety. Doc. 8-21 at 84. She had "problems with her anxiety at times and wish[ed] to see a counselor." Doc. 8-21 at 85.

On November 3, 2023, Wilson saw Dr. James Beretta for neck and low back pain. Doc. 8-21 at 75. She reported no psychiatric symptoms. Doc. 8-21 at 77. On November 13, 2023, Dr. Beretta filled out a physical capacities form primarily relating to Wilson's hand and back pain. Doc. 8-21 at 54.

On November 28, 2023, Wilson had a psychological assessment by June Nichols, a licensed psychologist. Doc. 8-21 at 55. In her assessment, Nichols summarized Wilson's medical history. Doc. 8-21 at 55–58. Wilson stated that she had been homeless since 2016, had been in several abusive relationships, and had

been incarcerated, and stated that she had had substance abuse issues since adolescence. Doc. 8-21 at 59. She was "staying with her grandchildren's father" at the time. Doc. 8-21 at 59. Nichols noted that Wilson had been diagnosed with ADHD, and that Wilson reported memory problems. Doc. 8-21 at 59. Nichols stated that Wilson arrived "slightly disheveled," moved constantly, and spoke rapidly with "difficulty staying on a timeline." Doc. 8-21 at 60. Wilson reported that she did not "like to be in a crowd" because she felt like people were watching her and it made her self-conscious. Doc. 8-21 at 60. Nichols estimated that Wilson was in the low average intellectual range. Doc. 8-21 at 61. Nichols opined that Wilson met the criteria for generalized anxiety disorder, bipolar I disorder, and a history of ADHD and substance abuse. Doc. 8-21 at 61–63. Nichols submitted a mental health source statement opining that Wilson could understand, remember, and carry out short and simple instructions, could not maintain concentration and pace for 2 hours, could not perform activities on a schedule and be punctual, could not sustain an ordinary work routine without special supervision, could not adjust to routine and infrequent work changes, could not interact with coworkers, could not maintain socially acceptable neatness and cleanliness, would be off task 50% of the day, and would miss 15 days of work per month for psychological symptoms. Doc. 8-21 at 64. Nichols opined that alcohol and drug use did not cause or affect Wilson's medical condition and the absence of drug or alcohol use would not improve her condition. Doc. 8-21 at 64.

Nichols opined that the limitations existed back to January 1, 2017. Doc. 8-21 at 64.

On December 27, 2023, Wilson saw Dr. McCain at Quality of Life with low back pain. Doc. 8-21 at 80. She also sought a referral for her hand pain. Doc. 8-21 at 80. She was positive for "behavioral problems." Doc. 8-21 at 81. She had anxiety and was referred to behavioral health. Doc. 8-21 at 83.

On February 2, 2024, Wilson went to Quality of Life with reports of a mild episode of major depressive disorder. Doc. 8-23 at 68. She was living with someone at the time, but was planning to find somewhere else to live if she got disability benefits. Doc. 8-23 at 69. Wilson denied substance use and reported that she got anxious and upset easily and felt depressed. Doc. 8-23 at 69. Wilson was anxious but otherwise her mental status was unremarkable and appropriate. Doc. 8-23 at 70. She was noted to have social support. Doc. 8-23 at 70.

On April 22, 2024, Wilson went to Quality of Life for psychotherapy. Doc. 8-23 at 72. Her mental status was poor, with angry mood, distractible racing thought process, delusional perception, distracted attention, impaired judgment, and impaired recent memory. Doc. 8-23 at 73. Wilson was living with a friend but was not sure if she would remain. Doc. 8-23 at 74.

On June 8, 2024, Wilson went to the Riverview Regional Medical Center emergency department with a chief complaint of homelessness. Doc. 8-22 at 31–32. She denied any medical complaints, and stated that she was there "for discovery

of additional resources." Doc. 8-22 at 32. Her only psychological symptom was stress. Doc. 8-22 at 33.

On June 10, 2024, Wilson was admitted to Atrium Health medical center for detox for alcohol abuse. Doc. 8-23 at 2. She reported infrequent use of methamphetamine and opioids, and drinking "anywhere from 1 pint to 1/5 of whiskey per day, depending on how much she can obtain." Doc. 8-23 at 2. Wilson reported that she was homeless and had been "moving from place to place frequently." Doc. 8-23 at 2. Her urine test was positive for amphetamines, opiates, and marijuana. Doc. 8-23 at 4. Wilson denied depression but reported anxiety. Doc. 8-23 at 6. She was cooperative and friendly and denied hallucinations. Doc. 8-23 at 6. She was discharged on June 15, 2024, with a final diagnosis of alcohol abuse and polysubstance abuse. Doc. 8-23 at 22–24.

On June 16, 2024, Wilson presented at the Gadsden Regional Medical Center with acute alcohol intoxication. Doc. 8-22 at 34. She stated that she had gotten out of rehab the previous day and thought she might need a psychological evaluation. Doc. 8-22 at 34. Wilson stated that she was "homeless and has nowhere to go," and "voice[d] depression but [was] not acutely depressed." Doc. 8-22 at 34. Wilson's daughter provided information that Wilson had gotten out of rehab, gone to her daughter's house, started drinking, and become belligerent. Doc. 8-22 at 34. Wilson reported current methamphetamine and marijuana abuse. Doc. 8-22 at 35.

On June 27, 2024, Wilson returned to Atrium Health for detox because she had resumed drinking. Doc. 8-23 at 26. She tested negative for drugs. Doc. 8-23 at 28. She denied depression but reported anxiety. Doc. 8-23 at 30. Wilson was discharged on July 2, 2024. Doc. 8-23 at 33–34, 53. The records show that Wilson was going to finish her addiction recovery at Beauty for Ashes. Doc. 8-23 at 54.

On July 12, 2024, Wilson saw Dr. McCain at Quality of Life for a urinary tract infection and medication refill. Doc. 8-23 at 75. She was nervous and anxious. Doc. 8-23 at 76.

On August 12, 2024, Wilson saw Dr. Janie Teschner for a medical examination. Doc. 8-22 at 2. Wilson reported a history of back pain, hand pain, neck pain, lupus, COPD, schizoaffective disorder with depression, and anxiety. Doc. 8-22 at 2–3. Dr. Teschner noted that Wilson had been hospitalized with psychosis multiple times, but "all while using methamphetamine," and that she had been diagnosed with bipolar mania "but only in the context of methamphetamine abuse." Doc. 8-22 at 3. Dr. Teschner stated that it was "unclear if she has this condition when not abusing drugs." Doc. 8-22 at 3. Dr. Teschner stated that Wilson denied using methamphetamine "much." Doc. 8-22 at 3. Wilson reported chronic anxiety, panic attacks, and social phobia. Doc. 8-22 at 3. Wilson was "pleasant and cooperative" and gave good effort. Doc. 8-22 at 4. Dr. Teschner opined in a medical source statement that Wilson would have difficulty maintaining concentration and

completing tasks, would have trouble being punctual and interacting with others at work, would become upset with routine changes, would be off task, would have trouble remembering what she needs to do, would "likely miss work frequently," had poor memory, and had a poor prognosis. Doc. 8-22 at 5. Dr. Teschner's diagnoses for Wilson included major depressive disorder, generalized anxiety disorder, personality disorder, and homelessness. Doc. 8-22 at 5–6. She provided a mental health source statement opining that Wilson could understand, remember, and carry out short and simple instructions; could not pay attention, be punctual, sustain a routine without special supervision, adjust to routine and infrequent work changes, or interact with coworkers; and could maintain basic standards of cleanliness and neatness. Doc. 8-22 at 9. She opined that Wilson would be off task 50% of a work day and would miss 15 days of work per month. Doc. 8-22 at 9. However, Dr. Teschner then submitted another statement in which she opined that Wilson could maintain attention and concentration for at least 2 hours, would be off task 30% of a work day, and would miss 20 days of work per month. Doc. 8-22 at 12.

On September 25, 2024, Wilson saw Dr. McCain at Quality of Life for musculoskeletal pain and prescription refills. Doc. 8-23 at 81. She reported having trouble with being short-tempered and on edge. Doc. 8-23 at 82. She was nervous and anxious. Doc. 8-23 at 82. She was on Zoloft at the time and received a refill.

Doc. 8-23 at 84.

On October 4, 2024, Wilson returned to Quality of Life for psychotherapy for anxiety and depression. Doc. 8-23 at 88. She had tested positive for drugs and alcohol, and when confronted denied that the tests were hers. Doc. 8-23 at 89. Her mental status was poor, and she had delusional perception and impaired judgment. Doc. 8-23 at 90. She stated she had "had enough and she was going to talk to someone else." Doc. 8-23 at 89.

### B. Social Security proceedings

#### 1. Initial application and denial of benefits

On March 31, 2022, Wilson filed an application for Supplemental Security Income (SSI) benefits, alleging disability due to lupus, degenerative bone disease, inability to bend the fingers of her right hand, head injury, multiple car accidents, inability to lift over 10 pounds, and mental health issues, with an alleged onset date of November 23, 2021. Doc. 8-4 at 2–3; Doc. 8-9 at 2; Doc. 8-10 at 2–13. Wilson had filed prior applications which had been denied. Doc. 8-19 at 2–3.

On September 30, 2022, Wilson's application was denied at the initial level. Doc. 8-4 at 2–13. On October 10, 2022, Wilson requested reconsideration of the initial denial. Doc. 8-5 at 13; Doc. 8-4 at 30. Her application again was denied at the reconsideration level. Doc. 8-4 at 16–30.

On October 18, 2023, Wilson's counsel submitted a "Dire Need Request" for

expedited processing because of Wilson's homelessness. Doc. 8-5 at 73–74.

#### 2. First ALJ hearing

On March 7, 2024, the ALJ conducted a telephonic hearing on Wilson's application for benefits. Doc. 8-3 at 78–80. Wilson testified that she had one adult daughter. Doc. 8-3 at 83–84. Wilson gave her address as an apartment in Gadsden, Alabama, and said she was staying with a woman who did not like to live alone "for a place to stay." Doc. 8-3 at 83–84. Wilson testified that she had no money coming in but did have food stamps. Doc. 8-3 at 84–85. Wilson testified that she had previously done some work cleaning homes and working as a private sitter, but had not had regular work since 2022. Doc. 8-3 at 86–87. She also testified that she had had periods of incarceration on drug and alcohol charges, but she had no current pending charges. Doc. 8-3 at 87–88. Wilson testified that she went to rehab in 2022 and subsequently had a relapse, but had been clean of prescription drug use for about six months and marijuana for about three months. Doc. 8-3 at 90–91.

Wilson testified that the main reason she could not work is that she had problems "being in the public" and that she could not "be around a lot of people." Doc. 8-3 at 93. Wilson testified that she could not work because of her problems being around people, her back pain, and problems with her hands. Doc. 8-3 at 96. Wilson testified that she obtained health insurance in August 2023, but had to forgo treatment for her hands and mental health medication because she could not afford

them. Doc. 8-3 at 99–100. Wilson testified that she had not had treatment for her lupus for a while because she could not afford to go to the doctor. Doc. 8-3 at 102.

Vocational Expert (VE) John Yent testified that a hypothetical person with Wilson's age, education, past work experience, transferable skills, and limitations could perform Wilson's past work as a house cleaner and could perform other jobs in the economy, including storage facility rental clerk and routing clerk. Doc. 8-3 at 101–05. However, VE Yent testified that only being able to remember instructions for 15 minutes or needing frequent supervision would preclude employment. Doc. 8-3 at 105–07. VE Yent testified that needing to miss 4 days of work per month or being off task 20% of the day would also preclude employment. Doc. 8-3 at 107.

### 3. First ALJ decision and appeal

On May 24, 2024, the ALJ entered an unfavorable decision on Wilson's application for benefits. Doc. 8-4 at 31–51. The Appeals Council subsequently remanded the case to the ALJ, finding that the ALJ's decision did not contain adequate evaluation of the administrative medical findings in the RFC determination and did not adequately explain consistency and supportability when considering the medical opinion of Dr. Jimmy Oguntuyo. Doc. 8-4 at 58–61. The Appeals Council directed the ALJ to "[g]ive further consideration to the claimant's maximum residual functional capacity" and to obtain evidence from a vocational expert as needed. Doc. 8-4 at 61–62.

On November 4, 2024, Wilson requested a telephonic hearing before the ALJ. Doc. 8-7 at 52. On March 11, 2025, Wilson requested that a prior claim be reopened. Doc. 8-13 at 46.

**4. Second ALJ hearing**

On March 11, 2025, after remand, the ALJ conducted another telephonic hearing on Wilson's application for benefits. Doc. 8-3 at 54–56. During the hearing, Wilson's counsel asked that "the prior claim be reopened," referencing a claim filed on March 3, 2021, and denied on November 22, 2021. Doc. 8-3 at 58. Wilson's counsel also requested amendment of the alleged onset date to November 30, 2021, Wilson's 50th birthday. Doc. 8-3 at 58. The ALJ amended the alleged onset date, and stated that the ALJ would "look and see about reopening the prior claim." Doc. 8-3 at 58.

In the hearing, Wilson testified that she had 1 daughter who was 35 years old. Doc. 8-3 at 59. The ALJ asked Wilson for her address, and she gave an address in Gadsden but then clarified that the address belonged to her sister, and that she was staying with a friend while she was on a waiting list for housing. Doc. 8-3 at 59–60. Wilson testified that she had food stamps but no other money coming in. Doc. 8-3 at 61. Wilson testified that she was still smoking cigarettes, but had "cut down a lot," and had "been clean" of drug use for six or seven months. Doc. 8-3 at 64. Wilson testified that she had been admitted to a psychiatric ward in 2020 and was

not using drugs at that time. Doc. 8-3 at 67.

VE Renee Smith then testified that a hypothetical person with the same age, education, and RFC as Wilson could perform jobs in the national economy, including "marker" and "routing clerk." Doc. 8-3 at 68. VE Smith testified that, with additional hand restrictions, a hypothetical individual like Wilson could perform jobs including "router." Doc. 8-3 at 68–70. VE Smith testified that, if an individual missed 4 days of work per month or was off task 20% of the time, those limitations would preclude work. Doc. 8-3 at 70. VE Smith testified that an individual could miss no more than one day of work per month to maintain employment. Doc. 8-3 at 70.

**5. Second ALJ decision (the decision on appeal)**

On April 4, 2025, the ALJ entered an unfavorable decision on Wilson's application for benefits. Doc. 8-3 at 19–45. The ALJ recounted the procedural history of Wilson's application for benefits, including the fact that the ALJ had issued a previous unfavorable decision, but that the Appeals Council had remanded the decision on the basis that "the decision did not contain an adequate evaluation of the prior administrative medical findings in assessing the claimant's residual functional capacity." Doc. 8-3 at 22. The ALJ then found that Wilson "has not been under a disability within the meaning of the Social Security Act since March 31, 2022, the date the application was filed." Doc. 8-3 at 23.

In the decision, the ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 416.920(a); *Winschel*, 631 F.3d at 1178). Doc. 8-3 at 23–24. The ALJ found that Wilson had not engaged in substantial gainful activity since March 31, 2022, the application date. Doc. 8-3 at 25. The ALJ found that Wilson had severe impairments of "degenerative disc disease and scoliosis, lupus erythematosus, depression, anxiety disorder, schizoaffective disorder, nicotine dependence, and alcohol use disorder." Doc. 8-3 at 25. The ALJ stated that "there is considerable overlap among the symptoms of the claimant's various psychiatric diagnoses, but regardless of the diagnostic label attached, [the ALJ] considered the claimant's psychiatric symptoms as a whole and their resulting limitations in [the ALJ's] evaluation of the listing criteria and assessment of the claimant's residual functional capacity." Doc. 8-3 at 25. The ALJ also found that Wilson suffered from nonsevere polysubstance use disorder and chronic obstructive pulmonary disease (COPD). Doc. 8-3 at 25.

The ALJ found that Wilson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 8-3 at 26. In making that finding, the ALJ stated that "[t]he severity of the claimant's mental impairments, considered singly and in combination, does not meet or medically equal the criteria of listings 12.03, 12.04, or 12.06." Doc. 8-3 at 27. The ALJ then considered

"whether the 'paragraph B' criteria are satisfied," and recounted the standard for the Paragraph B Criteria, which require that "the mental impairments must result in one extreme limitation or two marked limitations out of the four broad areas of mental functioning." Doc. 8-3 at 27. The ALJ found that Wilson had a moderate limitation in understanding, remembering or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a moderate limitation in adapting or managing herself. Doc. 8-3 at 27. The ALJ then found that, "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." Doc. 8-3 at 28.

The ALJ also found that Wilson's "mental impairments do not satisfy the 'C criteria' of the applicable listings." Doc. 8-3 at 28. In making that determination, the ALJ stated that the Paragraph C Criteria "require a medically documented history of the existence of the disorder over a period of at least two years along with both ongoing treatment (medication, therapy, psychosocial support, or highly-structured setting) that diminishes the signs and symptoms and marginal adjustment, i.e., minimal capacity to adapt to changes in the environment or to new demands." Doc. 8-3 at 28. The ALJ included no further discussion of the Paragraph C Criteria.

The ALJ then determined Wilson's RFC, finding that Wilson had the capacity to perform "light work," except that she could frequently push or pull bilaterally;

could never climb ladders, ropes, or scaffolds; could frequently stoop and occasionally kneel, crouch, or crawl; could frequently reach bilaterally; could frequently handle and finger with the left upper extremity and occasionally handle and finger with the right upper extremity; could not be exposed to excessive vibration; could never be exposed to workplace hazards such as moving mechanical parts and high, exposed places; could understand, remember, and carry out simple instructions; could tolerate occasional interaction with the public and occasional interaction with coworkers and supervisors; and could deal with occasional changes in the work setting. Doc. 8-3 at 28. In making the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," according to the requirements of 20 C.F.R. § 416.929 and SSR (Social Security Ruling) 16-3p. Doc. 8-3 at 28. The ALJ also stated that the ALJ had considered the medical opinions and prior administrative medical findings. Doc. 8-3 at 28.

In assessing Wilson's RFC and the extent to which Wilson's symptoms limited her function, the ALJ's decision stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine

the extent to which they limit the claimant's work-related activities." Doc. 8-3 at 28–29.

The ALJ gave an exhaustive summary of Wilson's testimony at the two hearings. Doc. 8-3 at 29–30. In the recitation, the ALJ noted that Wilson testified that she "was living with a 70-year-old lady who provided her with a place to live in return for sitting with her because the lady did not like being alone." Doc. 8-3 at 29. The ALJ then found, "[a]fter careful consideration of the evidence," that Wilson's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Doc. 8-3 at 30.

The ALJ then provided a thorough summary of Wilson's medical records. Doc. 8-3 at 30–38. The ALJ stated that Wilson had a history of treatment for anxiety and depression, as well as a May 2020 psychiatric admission, after which she was diagnosed with schizoaffective disorder, bipolar type. Doc. 8-3 at 30. In the summary of Wilson's medical records, the ALJ included recitation of Wilson's many appointments at which she complained of anxiety, depression, and other mental health issues. Doc. 8-3 at 31–35. The ALJ also stated that Wilson had been prescribed mental health medication including Prozac and had been referred for

psychotherapy. Doc. 8-3 at 32. The ALJ included in the recitation of Wilson's medical records several references to Wilson's homelessness. Doc. 8-3 at 30–31, 35–36. The ALJ noted that there was no record of medical treatment between November 10, 2022, and September 13, 2023. Doc. 8-3 at 33.

The ALJ summarized Wilson's September 6, 2022 consultative psychological examination with Jerry Bynum. Doc. 8-3 at 32. The ALJ noted that Wilson was living in The Father's House, and that she had been prescribed Prozac. Doc. 8-3 at 32. The ALJ stated that Bynum "offered a diagnostic impression of unspecified anxiety disorder, moderate, also noting a history of polysubstance abuse in reported remission and a rule-out diagnosis of unspecified personality disorder." Doc. 8-3 at 32.

The ALJ then provided a thorough summary of Wilson's September 21, 2022 consultative medical examination with Dr. Jimmy Oguntuyo, during which Wilson reported low back pain and hand pain. Doc. 8-3 at 32. The ALJ stated that Wilson had difficulty flexing the fingers of her right hand and had reduced range of motion in her spine. Doc. 8-3 at 32–33.

The ALJ provided a summary of a consultative psychological examination with Dr. June Nichols. Doc. 8-3 at 34. The ALJ found that "Dr. Nichols stated that the claimant met diagnostic criteria for bipolar I disorder with mixed features, moderate." Doc. 8-3 at 34.

The ALJ included a summary of an examination with Dr. Janie Teschner, who reviewed Wilson's records and examined her at the request of Wilson's attorney. Doc. 8-3 at 37. The ALJ stated that Wilson reported that she had pain in her back and hands and "schizoaffective disorder with depression and anxiety," but Dr. Teschner found Wilson pleasant and cooperative. Doc. 8-3 at 37.

The ALJ then stated that, in considering Wilson's RFC, the ALJ considered her allegations relating to her hands and spine. Doc. 8-3 at 38. The ALJ found that Wilson had "mental impairments that would be expected to cause some limitation," but—regarding her alleged inability to be around people—found her allegations unsupported by the record. Doc. 8-3 at 38. The ALJ found that "the claimant has had very little mental health treatment since filing this application for disability benefits, but even with only limited use of psychiatric medication and counseling, she has not had any emergency room visits or admissions for treatment of psychiatric symptoms," and found that Wilson should be limited to no more than occasional social interactions and changes in the work setting. Doc. 8-3 at 38–39.

The ALJ stated that the ALJ had "fully considered the medical opinions and prior administrative medical findings in this claim in accordance with 20 C.F.R. § 416.920(c)," but that the ALJ rarely found opinions to be simply persuasive or unpersuasive. Doc. 8-3 at 39. The ALJ found the initial administrative opinions of Dr. Victoria Hogan and Krishna Reddy mostly persuasive, found the opinion of

psychological consultant Yamir Laboy to be somewhat persuasive, and found the opinion of psychological consultant Peter Sims to be not wholly persuasive. Doc. 8-3 at 39–41.

The ALJ found the opinion of Dr. Bynum "generally persuasive, as it is related to the source's specialty and is supported by relevant evidence, objective testing and evaluation, and adequate explanation." Doc. 8-3 at 41. The ALJ found that Dr. Oguntuyo's opinion was of limited use and mildly persuasive as to Wilson's physical limitations. Doc. 8-3 at 41. The ALJ found the opinion of Dr. Nichols to be only mildly persuasive, finding that Dr. Nichols' opinion "contains extremes that are neither explained by the accompanying narrative from the onetime examination, nor properly supported by the longitudinal record." Doc. 8-3 at 42. The ALJ found reports from Dr. James Beretta and Dr. Janie Teschner to be unpersuasive. Doc. 8-3 at 43. The ALJ then considered the third party function reports submitted by Wilson's daughter. Doc. 8-3 at 43.

The ALJ found that Wilson had no past relevant work. Doc. 8-3 at 44. The ALJ then found that, considering Wilson's age, education, work experience, and RFC, along with the testimony of VE Smith, there existed jobs in significant numbers in the national economy that Wilson could perform, including jobs such router and trim attacher. Doc. 8-3 at 44–45. Accordingly, the ALJ found that Wilson had not been disabled, as defined in the Social Security Act, from March 31, 2022

(the date the application was filed), through the date of the decision. Doc. 8-3 at 45.

**6. Second Appeals Council decision**

On May 22, 2025, Wilson requested review of the April 4, 2025 ALJ decision by the Appeals Council. Doc. 8-8 at 36–37; *see* Doc. 8-14 at 2–30. On July 1, 2025, the Appeals Council denied Wilson's request for review of the ALJ's April 4, 2025 decision, finding no reason to review the ALJ's decision, and making the ALJ's decision the final decision of the Commissioner. Doc. 8-3 at 2–6.

## DISCUSSION

Having carefully considered the record and briefing, the court must reverse and remand because—under the controlling Eleventh Circuit caselaw—the court cannot determine that the ALJ's decision was supported by substantial evidence. In briefing, Wilson argues in relevant part that the ALJ erred and the decision was not based on substantial evidence because the ALJ failed to adequately consider Wilson's homelessness and failed to properly and adequately consider whether Wilson met "the C Criteria of listings 12.03, 12.04, and 12.06." Doc. 15 at 28, 34–36. The Commissioner argues that "the ALJ's decision shows that he was aware of and considered Plaintiff's homelessness as he evaluated the evidence of record to determine Plaintiff's RFC" (Doc. 19 at 5), but does not otherwise respond to Wilson's argument regarding the Paragraph C Criteria.[2] *See* Doc. 19. Because the

---

[2] Generally, "[w]hen a party fails to respond to an argument or otherwise address a

ALJ's assessment of the Paragraph C Criteria amounted to just a restatement of the standard without further analysis or explanation, the court cannot conclude that the ALJ's decision was supported by substantial evidence. And, because resolution of that issue compels reversal, the court will pretermit consideration of the other issues that Wilson raised in this appeal.

A claimant bears the burden of proving that she meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (quotation marks omitted). "To equal a listing, the medical findings must be at least equal in severity and duration to the listed findings." *Id.*

Section 12.00 of the listings sets out the listings for mental disorders arranged in eleven diagnostic categories. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00. Three categories are relevant here: "schizophrenia spectrum and other psychotic

claim, the Court deems such an argument or claim abandoned." *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (quotation marks omitted). Some courts apply this general rule of thumb in Social Security appeals. *See, e.g.*, *Kenner v. Berryhill*, 316 F. Supp. 3d 530, 538–39 (D.D.C. 2018); *Tracey N. v. King*, 2025 WL 416824, at *3 (N.D. Ill. Feb. 6, 2025); *Jeffrey C. v. Kijakazi*, 2023 WL 4760603, at *3 (D. Or. July 26, 2023). But, as Wilson admits (Doc. 20 at 5–6), courts in the Eleventh Circuit ordinarily have not applied this rule in Social Security appeals; and, without clearer guidance from the Eleventh Circuit, this court need not, and will not, apply that abandonment rule in this appeal.

disorders" (12.03); "depressive, bipolar and related disorders" (12.04); and "anxiety and obsessive-compulsive disorders" (12.06). 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(1).

"Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; [a claimant's] mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(2). The Paragraph A Criteria consist of a set of necessary medical findings, the Paragraph B Criteria consist of four categories of impairment-related functional limitations, and the Paragraph C Criteria are designed to evaluate "serious and persistent mental disorders." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(2). The Paragraph C Criteria are an alternative to the Paragraph B Criteria, meaning that the claimant must satisfy the criteria of either Paragraphs A and B or Paragraphs A and C to meet these listings. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(E)–(G).

To meet the requirements of Paragraph C, a plaintiff must meet three criteria. First, she must show that her "mental disorder . . . is 'serious and persistent,' that is, [she] ha[s] a medically documented history of the existence of the disorder over a period of at least 2 years." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(2)(c). Second, she must present evidence of "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that

diminishes the symptoms and signs or [her] mental disorder." 20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.03(C)(1), 12.04(C)(1), 12.06(C)(1). Third, she must produce evidence of "[m]arginal adjustment," defined as "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.03(C)(2), 12.04(C)(2), 12.06(C)(2). A companion regulation adds that the SSA will consider a claimant to have shown only marginal adjustment "when the evidence shows that changes or increased demands have led to exacerbation of [her] symptoms and signs and to deterioration in [her] functioning; for example, [she has] become unable to function outside of [her] home or a more restrictive setting, without substantial psychosocial supports." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(G)(2).

Because meeting a listing requires meeting the Paragraph A Criteria and the Paragraph B *or* Paragraph C Criteria, the ALJ needed to adequately address both Paragraphs B and C to effectively explain why Wilson did not meet a listing. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(E)–(G).

Here, the ALJ found that Wilson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Doc. 8-3 at 26. The ALJ stated that the ALJ considered all listings, "but specifically listings 1.15, 12.03, 12.04, 12.06, and 14.02." Doc. 8-3 at 26. The ALJ stated that the severity of Wilson's mental impairments did not meet or equal

"the criteria of listings 12.03, 12.04, or 12.06." Doc. 8-3 at 26. In reaching that conclusion, the ALJ considered whether the Paragraph B listings were satisfied—that is, whether Wilson's impairments resulted in "one extreme limitation or two marked limitations out of the four broad areas of mental functioning." Doc. 8-3 at 27. The ALJ found that Wilson had moderate limitations in all four areas of mental functioning. Doc. 8-3 at 27–28.

With respect to the Paragraph C Criteria, the ALJ "further f[ou]nd that [Wilson's] mental impairments do not satisfy the 'C criteria' of the applicable listings. These criteria require a medically documented history of the existence of the disorder over a period of at least two years along with both ongoing treatment (medication, therapy, psychosocial support, or highly-structured setting) that diminishes the signs and symptoms and marginal adjustment, i.e., minimal capacity to adapt to changes in the environment or to new demands." Doc. 8-3 at 28.

This is the entirety of the ALJ's discussion of the Paragraph C Criteria. And (as explained above), the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *See Cornelius*, 936 F.2d at, 1145–46.

The ALJ's finding that Wilson did not meet the Paragraph C Criteria amounts to only a boilerplate recitation of the applicable standard for assessing the Paragraph C Criteria. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00. There is no

explanation or support for the finding that Wilson did not meet the criteria, and no citation to the record. This lack of explanation and citation to the record means the court cannot determine whether the ALJ conducted the proper legal analysis, and whether substantial evidence supports the ALJ's Paragraph C Criteria finding and consequent finding as to the relevant listings.

Nor did the ALJ's decision address the Paragraph A Criteria, such that any error as to the Paragraph C Criteria may have been harmless.

Furthermore, the court will look beyond the paragraph in the ALJ's decision that explicitly addresses the Paragraph C Criteria and examine the ALJ's decision as a whole to determine whether substantial evidence supports the Paragraph C determination. *See Raper v. Commissioner of Soc. Sec.*, 89 F.4th 1261, 1275 (11th Cir. 2024) ("it is proper to read the ALJ's decision as a whole, and . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses" (citations omitted)). Upon examination of the ALJ's decision on the whole, the record evidence that *could* support a finding that the Paragraph C Criteria were met, the ALJ's treatment of that evidence, and the ALJ's lack of any explanation with regard to the Paragraph C Criteria, the court cannot conclusively determine that substantial evidence supports the ALJ's decision.

Importantly (again), this court cannot "decide the facts anew" or "reweigh the evidence." *See Winschel*, 631 F.3d at 1178. That said, the record appears to contain

significant evidence that—on the first criterion for Paragraph C—could support a finding that Wilson had persistent serious mental health issues including generalized anxiety disorder for a period of more than two years. The record shows that, as early as 2014, Wilson was experiencing anxiety and compulsive thoughts, but was not taking medication due solely to inability to afford it. *See* Doc. 8-15 at 18–41. She presented with chronic anxiety and depression in 2016 and 2017 but still was not taking medication because of the expense. Doc. 8-15 at 49–51, 58. In 2020, Wilson was admitted for inpatient psychiatric care due to paranoia and mania and was diagnosed with schizoaffective disorder, bipolar type. Doc. 8-16 at 6–9; Doc. 8-15 at 110–11. Wilson was paranoid and delusional in February 2021 (Doc. 8-18 at 58), and Wilson continued to consistently report anxiety from 2021 onward. *See, e.g.*, Doc. 8-19 at 5–7, 11, 60; Doc. 8-21 at 11, 81–84; Doc. 8-22 at 3; Doc. 8-23 at 6, 30, 70, 76, 82, 88. And, while the ALJ found in the decision that "the record of evidence does not document any treatment between November 10, 2022, and September 13, 2023," the record appears to show otherwise. Doc. 8-3 at 33. The record shows that Wilson attended CED Mental Health Center from March to May 2023, and that she saw Dr. McCain in September and October 2023, including for anxiety. Doc. 8-21 at 18–24, 30–41, 85, 100–02. Additionally, in consultative exams with Bynum, Nichols, and Teschner, all three evaluators noted a history of anxiety disorder and other mental health conditions, and all three included diagnoses of anxiety disorder.

Doc. 8-20 at 180, 182; Doc. 8-21 at 61–63; Doc. 8-22 at 5–6. In fact, the ALJ recognized Wilson's anxiety disorder at multiple points in the ALJ's decision, finding that Wilson had severe impairments of depression, anxiety disorder, and schizoaffective disorder, and finding in the RFC determination that Wilson had a history of anxiety and depression and had been prescribed medication for her mental health. Doc. 8-3 at 25, 30–32. Based on the evidence of Wilson's consistent diagnosed mental health issues, and the ALJ's recognition of that evidence, and without any explanation or identified supporting evidence in the ALJ's decision, the court cannot conclude that substantial evidence supports the ALJ's finding that Wilson did not meet the first criterion for Paragraph C—a medically documented history of the existence of the disorder over a period of at least 2 years. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(A)(2)(c).

On the second criterion for Paragraph C, the record and the ALJ's decision also seem to contain evidence from which the ALJ could have found that Wilson had "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs or [her] mental disorder." 20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.03(C)(1), 12.04(C)(1), 12.06(C)(1). In April 2021, Wilson reported taking Paxil for her anxiety and depression and it was helping her. Doc. 8-19 at 6. She was also prescribed medication including Fluoxetine, Prozac, and Zoloft for anxiety and

received psychotherapy. Doc. 8-10 at 21; Doc. 8-21 at 12; Doc. 8-20 at 180–81, 185; Doc. 8-23 at 72, 84, 88. Wilson was receiving therapy as late as October 2024 and said she would "talk to someone else"; she also had an active Zoloft prescription. Doc. 8-23 at 84, 88–90. Accordingly, the record seems to contain support for a finding that ongoing treatment diminished Wilson's disorder. Further, the ALJ essentially acknowledged that treatment helped Wilson's disorder, finding that "the claimant has had very little mental health treatment since filing this application for disability benefits, but even with only limited use of psychiatric medication and counseling, she has not had any emergency room visits or admissions for treatment of psychiatric symptoms." Doc. 8-3 at 38–39. Because the record and the ALJ's decision seem to contain sufficient evidence relating to Wilson's treatment, in the absence of any explanation or analysis from the ALJ on the second criterion of Paragraph C, the court cannot conclude that substantial evidence supports this ALJ's finding.

Finally, on the third criterion of Paragraph C, there also appears to be evidence in the record that could support a finding of marginal adjustment. As Wilson has argued (and as explained above), throughout the record, there is evidence that Wilson was homeless. Doc. 8-3 at 59–60; Doc. 8-10 at 30, 58, 73; Doc. 8-15 at 111; Doc. 8-18 at 6–7, 47, 56–57; Doc. 8-19 at 6, 50, 60; Doc. 8-20 at 180–81; Doc. 8-21 at 19, 59; Doc. 8-22 at 16–28, 31–32; Doc. 8-23 at 2, 74. She also reported

homelessness as a consistent stressor, that stress increased her anxiety, and that she had to forgo mental health medication at times because she could not afford it. Doc. 8-3 at 99–100; Doc. 8-15 at 110–11; Doc. 8-19 at 6; Doc. 8-19 at 60; Doc. 8-21 at 19; Doc. 8-22 at 33. In the ALJ's decision, the ALJ mentioned Wilson's homelessness (Doc. 8-3 at 10–32, 35–36), and discussed the findings of various examinations in the context of Wilson's daily functioning, but did not explain how that evidence supported a finding against marginal adjustment and a minimal capacity to adapt to changes and demands, particularly when considered along with the evidence of Wilson's continued homelessness, her reports that homelessness was a stressor, and her continued mental health symptoms. As a result, the court cannot conclude that substantial evidence supports the ALJ's finding on the third criterion of Paragraph C.

In sum, without any explanation or analysis from the ALJ, the court cannot conclude that substantial evidence supports the ALJ's findings as to the Paragraph C Criteria. Given the ALJ's decision, it is difficult (if not impossible) to review and assess the ALJ's Paragraph C Criteria findings, especially when there appears to be record evidence that arguably could support a finding that Wilson satisfies the criteria. Again, an ALJ's failure "to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *See Cornelius*, 936 F.2d at, 1145–46; *Keeton v. Department of*

*Health & Hum. Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (same). The ALJ's discussion of the Paragraph C Criteria is only a recitation of the standard that is lacking in detail, record citation, explanation, and analysis, and the overall analysis in the ALJ's decision does not allow the court to conclude that substantial evidence otherwise supports the decision. *See Raper*, 89 F.4th at 1275; *Martin*, 894 F.2d at 1529; *Crawford*, 363 F.3d at 1158.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this memorandum opinion. The court separately will enter final judgment.

**DONE** and **ORDERED** this September 18, 2026.

**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE